Filed 8/23/23  In re Christopher N. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CHRISTOPHER N., a Person Coming Under the Juvenile Court Law. | B325916 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK23704) |
| Plaintiff and Respondent, | |
| v. | |
| NADINE R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Davis, Juvenile Court Referee. Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Legal guardian and maternal grandmother Nadine R. (MGM) appeals from an order terminating her legal guardianship over her grandchild, Christopher N. (born September 2012). Her sole argument is the juvenile court failed to ensure that the Los Angeles County Department of Children and Family Services (DCFS) complied with its duties of inquiry and notice under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and California's equivalent law (Welf. & Inst. Code, § 224 et seq.). MGM requests a limited reversal of the order terminating her legal guardianship to allow DCFS to conduct a sufficient inquiry and investigation and provide proper notice.

We find DCFS has, thus far in the proceedings, conducted a sufficient inquiry and that proper notice was provided pursuant to ICWA.

Further, the proceedings below are ongoing, and the order terminating MGM's legal guardianship does not affect any tribe's right to intervene in the proceedings should the ongoing investigation reveal that Christopher is or may be an Indian child.

For these reasons, we affirm the order.

2

### FACTUAL AND PROCEDURAL BACKGROUND

**The family**

In 2015, the probate court granted MGM legal guardianship over Christopher because the child's mother, Victoria R. (mother) was incarcerated. Christopher has special needs, having been diagnosed with cerebral palsy and autism. He is non-verbal, and uses a wheelchair. Christopher's biological father is Bobby Joe N., Jr. (father).[1] At the time these proceedings were initiated in 2017, father was incarcerated.

**Initial referral and petition**

In June 2017, DCFS responded to a referral that MGM smoked crack cocaine in the home in front of Christopher. MGM admitted the allegation and that she started using crack cocaine about a month prior to the referral due to the stress of caring for Christopher. MGM denied an allegation that she left the child unsupervised.

On June 22, 2017, a petition on behalf of Christopher was filed pursuant to Welfare and Institutions Code section 300, subdivision (b), alleging that Christopher was at risk of serious harm as a result of MGM's substance abuse.[2] The petition was later amended to additionally allege that MGM suffered from mental and emotional problems, had a history of engaging in physical altercations, and that mother had a long criminal history.

---

[1] Although father remained an alleged father throughout these proceedings, mother and father each reported that prior DNA testing related to child support indicated father was Christopher's biological father.

[2] All further statutory references are to the Welfare and Institutions Code.

Attached to the petition was an ICWA- 010(A) form indicating that MGM reported the maternal family had no known American Indian ancestry.

**Detention**

The detention hearing was held on June 22, 2017. MGM completed a parental notification of Indian status form (ICWA—020) and reported having no American Indian ancestry as far as she knew. MGM informed the court she had no American Indian ancestry but did not know if the child's maternal grandfather had American Indian ancestry. Also, MGM did not know who Christopher's father was. The court found no reason to believe ICWA applied and ordered Christopher detained from MGM's custody.

**Investigation**

MGM subsequently reported possible Native American ancestry on the maternal side of the family, but she was unsure what tribe was involved. She reported Native American ancestry in both her family and mother's paternal family. MGM's father, Nathaniel R. (deceased), was part of the "'Gee chee' (unknown spelling) tribe." He was born in Tallulah, Louisiana. MGM also stated her mother, Lula M.F.R. is part of a tribe from Arkansas. In addition, MGM was told mother's biological father's family had American Indian ancestry. MGM stated mother's paternal grandmother lived in Arizona, but was unable to provide contact information.

When asked about American Indian ancestry, mother reported she probably had some, but was unable to further explain. Mother identified Bobby Joe N., Jr. as Christopher's biological father and indicated there had been a DNA test. MGM said father had not had any contact with the child since his birth

4

and had made clear that he did not wish to participate in the child's life. Father had made no effort to care for the child or meet his basic needs.

DCFS contacted Lula, who stated she did not know much about the family's Native American ancestry because her parents kept it a secret. However, her understanding was that it was "West Indian or Blackfoot." Lula reported her mother did not have any American Indian ancestry, but her father did. However, Lula did not know where her father was born, what year he was born, or any further information about him. Nathaniel was also allegedly American Indian, but Lula did not know what tribe, nor did she have any information about his parents or further information regarding American Indian ancestry related to Christopher.

In August 2017, DCFS sent Notice of Child Custody Proceeding for Indian Child (ICWA—030) forms to the Blackfeet Tribe, the Secretary of the Interior, and the Bureau of Indian Affairs. The notice also mentioned maternal family's alleged association with two tribes that are not federally recognized: the Geechee-Louisiana and West Indian tribes. The notice included mother's, MGM's, and Lula's identifying information and named Bobby Joe N., Jr., as Christopher's biological father.

DCFS subsequently received green card return receipts from the Blackfeet Tribe of Montana, the Bureau of Indian Affairs, and the Secretary of the Interior. DCFS later received documentation from the Blackfeet Tribe indicating Christopher was not eligible for enrollment.

**Jurisdiction and disposition**

Father signed a waiver form indicating he did not want to be physically present at the jurisdictional hearing and gave up that right. He did not want counsel or to participate by video.

On August 22, 2017, mother signed an ICWA- 020 form indicating she might have Cherokee Indian ancestry. The juvenile court's minute order noted mother was present in custody but was not brought into court due to court congestion. Mother later wrote to DCFS and stated she would be paroled in January 2018 and wanted to attend court after, but not before, her release. The juvenile court rescheduled the jurisdictional hearing.

At the March 13, 2018 hearing, the court noted that in a last minute information for the court, DCFS reported mother was institutionalized at Patton State Hospital. She was sent there from prison rather than being released.[3] The court proceeded to the adjudication given that the petition had been filed in August 2017 and the court was required to give substantial weight to the minor's need for prompt resolution of the matter. The juvenile court sustained an amended version of the petition based on MGM's substance abuse and mother's criminal history. The matter was continued for disposition.

---

[3] The dependency investigator received a telephone call from mother on February 6, 2018, stating mother was being held against her will at Patton State Hospital and she was sent there from prison instead of being released. The investigator noted that during the February 6, 2018 conversation, "Mother was jumping from unrelated topic to topic and wasn't able to have a fully cohesive conversation."

6

On May 29, 2018, the juvenile court declared Christopher a dependent child and removed him from MGM's custody. MGM and mother were provided reunification services, but father was denied such services. The court found there was no reason to know Christopher was an Indian child and ICWA did not apply.

**Reunification period**

DCFS interviewed mother at Patton State Hospital in June 2018. Mother was delusional and appeared confused about reality. She reported false information, such as she owned a home in Victorville, California and worked at Patton State Hospital prior to her incarceration. Mother reported she had many children besides Christopher and provided the names of the children. DCFS was not aware mother had any children other than Christopher. Mother reported speaking to Christopher on the phone and being able to understand the child even though he was non-verbal. DCFS was unable to obtain information about mother's mental health from the hospital due to privacy concerns, but the hospital social worker indicated she would try to obtain mother's consent to release her treatment information to DCFS.

In July 2018, mother became agitated and had difficulty understanding Christopher's diagnosis. Mother maintained the child was walking and talking when in her care. She appeared confused about reality. She requested DNA testing be done for mother and MGM as she suspected the child was not hers. Mother said she did not want to participate in services and would follow up with the necessary people once released from the hospital.

7

On November 27, 2018, the juvenile court terminated family reunification services for mother but continued them for MGM.

For the 18-month review hearing, DCFS reported father's whereabouts were unknown and mother remained in custody at Patton State Hospital.

**ICWA proceedings as to father**

On January 28, 2019, father made his first appearance in juvenile court and was appointed counsel. Father filed a statement regarding parentage (JV-505) and an ICWA-020 form indicating he might have American Indian ancestry with an unknown tribe on his father's maternal side. Father's paternal grandmother was no longer living. Father provided the name of an aunt, Jeanette C., who lived in Florida, but he did not have her telephone number. Father stated he could try to get in touch with her via Facebook. The court informed father that DCFS would be asking him to try to get in touch with her. The court found it had no reason to believe that ICWA applied but ordered DCFS to investigate father's possible Indian heritage.

On March 7, 2019, father confirmed he might have American Indian ancestry to DCFS. Father provided contact information for his niece, Ana, as she had more information regarding paternal aunt Jeanette C. Ana told the social worker she would provide the information in a week. The social worker asked father if he would assist and provide the information sooner. The social worker asked a second time for Jeanette C.'s contact information, and in its March 13, 2019 report, DCFS indicated it had not heard from father or Ana regarding the issue of American Indian heritage.

At the March 13, 2019 hearing, DCFS informed the court it had reached out to father but he was nonresponsive. As father was present in court, he stated he had "no idea what tribe or what my background is." Father said had been trying to contact his aunt or obtain contact information for DCFS. The court ordered father to do his best to contact Jeanette C. The court found no reason to believe that ICWA applied but ordered DCFS to continue to investigate.

**Further proceedings**

On March 13, 2019, the juvenile court terminated family reunification services and scheduled a section 366.26 hearing to select and implement a permanent plan for the child.

For the initial section 366.26 hearing scheduled for July 10, 2019, DCFS again sent ICWA-030 notice forms to the Blackfeet tribe. The notice identified father as also associated with the Blackfeet tribe and included the name of paternal aunt, Jeanette C., noting that her current address, former address, and date and place of birth were unknown. The Blackfeet tribe responded that based on its enrollment records, the child did not fall under the provisions of ICWA.

On November 5, 2019, DCFS was contacted by the child's paternal half-sibling, Shaquan N., who reported father had suffered a massive stroke and brain aneurism and was hospitalized. Father was immobile and was being provided 14-hour medical and nursing care.

On June 29, 2021 the juvenile court reinstated family reunification services for MGM pursuant to section 388 and took the section 366.26 hearing off calendar.

On March 8, 2022, the juvenile court again terminated MGM's reunification services.

9

In March 2022, DCFS was informed father had passed away and obtained father's death certificate.

At a section 366.26 permanency planning hearing on July 1, 2022, DCFS asked to continue the matter for 90 days for adoption assessment. The juvenile court granted the request, and ordered DCFS to provide "an ICWA update report" and "to inquire of all known maternal and paternal relatives as well as any relatives for the legal guardian with respect to any Indian heritage and provide that information to the court."

At a continued section 366.26 permanency planning hearing on October 3, 2022, the juvenile court ordered DCFS to "make inquiry and interview of all known paternal and maternal relatives as to ICWA and provide an update in the next report." Permanency planning was continued to January 31, 2023.

In December 2022, DCFS petitioned the juvenile court to terminate MGM's legal guardianship over Christopher.

On December 13, 2022, the juvenile court granted DCFS's section 388 petition and terminated MGM's legal guardianship over Christopher. The court found the child's visits with MGM detrimental to him and ordered no visits occur.

On December 13, 2022, MGM filed a notice of appeal.

## DISCUSSION

MGM contends DCFS failed to perform its duties under ICWA. MGM raises two specific issues on appeal: that DCFS failed to interview father's aunt, Jeanette C., about father's possible Indian heritage, and DCFS did not provide proper notice to the Cherokee tribe.

10

We find no ICWA error on the record before us. Further, we note that the court has ordered the ICWA investigation continue, as the proceedings are continuing below and an order terminating parental rights is not before us in this appeal.

## I.    Applicable law and standard of review

ICWA and related California statutes reflect the Legislature's intent "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." (25 U.S.C. § 1902; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) An "'Indian child'" is defined as any unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); § 224.1, subds. (a) & (b).)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case. These requirements are sometimes collectively referred to as the duty of initial inquiry." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741 (*Benjamin M.*).) "The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) The court and child welfare department "have an affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child. (*Ibid.*)

11

Under California law, the child welfare department's initial duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Under ICWA, the term "'extended family member'" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

The juvenile court must also inquire at each participant's first appearance in court whether the participant knows or has reason to know that the child is an Indian child. (§ 224.2, subd. (c).) In addition, the juvenile court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child. (*Ibid.*)

If the "initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' ([§ 224.2], subd. (e), italics added.) . . . [I]f that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a

12

'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*).)

We review a juvenile court's ICWA findings under the substantial evidence test, "'which requires us to determine if reasonable, credible evidence of solid value supports' the court's ICWA finding." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 8, 2022, S275578 (*Dezi C.*).) Even if substantial evidence does not support the juvenile court's ICWA findings, we may not reverse unless we find that error was prejudicial. (Cal. Const., art. VI, § 13; *Benjamin M., supra*, 70 Cal.App.5th at p. 742.)

## II.     No error occurred

### A.     *Failure to contact Jeanette C.*

MGM argues DCFS "did not interview Jeanette C. or document its efforts to do so." However, the record reveals that DCFS did not have any way of contacting Jeanette C. Despite repeated attempts to obtain her contact information, neither father nor his family were able to provide it. DCFS was not required to conduct an independent investigation to locate this individual. The record shows that under the circumstances DCFS undertook the best investigation it was able, and nothing further was required.

At father's initial appearance he filled out an ICWA-020 form indicating he might have Indian ancestry with an unknown tribe on his father's maternal side. His paternal grandmother was no longer living, but he provided the name of a paternal aunt, Jeanette C. He did not have her contact information, but agreed to attempt to contact her.

13

Despite DCFS's repeated requests, father was unable to provide contact information for the individual who might have information about his possible American Indian ancestry. With father's consent, DCFS contacted father's niece Ana, who also agreed to attempt to locate and provide Jeanette C.'s contact information. This also proved fruitless. While the juvenile court found it had no reason to believe Christopher was an Indian child, DCFS was ordered to continue its efforts to investigate the issue. Father subsequently suffered a massive stroke and brain aneurism and later died.

While DCFS is required to inquire as to Indian ancestry and act on any information it receives, DCFS "has no duty to conduct an extensive independent investigation for information." (*In re C.Y.* (2012) 208 Cal.App.4th 34, 40.) Thus, "[w]ithout reliable contact information, DCFS could not reasonably have been expected to interview extended family members." (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1083.) MGM points to no legal requirement that DCFS must conduct an independent search for missing family members other than a parent, Indian custodian, or guardian of the child.[4] DCFS is not required to "'cast about' for

---

[4]     Rules of Court, rule 5.481(a)(3) states: "If the parent, Indian custodian, or guardian does not appear at the first hearing, or is unavailable at the initiation of a proceeding, the court must order the person or entity that has the inquiry duty under this rule to use reasonable diligence to find and inform the parent, Indian custodian, or guardian that the court has ordered the parent, Indian custodian, or guardian to complete *Parental Notification of Indian Status* (form ICWA – 020)." There is no similar requirement that DCFS conduct such a search for missing extended family members.

information or pursue unproductive investigative leads."
(*D.S., supra,* 46 Cal.App.5th at p. 1053.)

Neither father, nor any relative on father's side, ever identified a specific tribe. The "suggestion of Indian ancestry" was insufficient to trigger the notice requirement. (*In re D.F.* (2020) 55 Cal.App.5th 558, 571.) Therefore, DCFS was not required to provide notice to any tribe on behalf of father. No error under ICWA occurred.

### B. *Failure to contact the Cherokee tribe*

On August 22, 2017, mother indicated possible Indian ancestry in the Cherokee tribe. MGM cites law indicating that notice under ICWA is error when the parent names a specific tribe and DCFS fails to notice that tribe. (*In re B.R.* (2009) 176 Cal.App.4th 773, 778, 785–786 (*B.R.*). In *B.R.*, a paternal aunt indicated possible Apache heritage. Although ICWA notices were sent to various other tribes, the court held notice was improper because the Apache tribe had not been noticed. (*Ibid.*) The court further held the lack of notice to the Apache tribe was not harmless error. (*Id.* at p. 785.)

The present matter is distinguishable. Under the circumstances of this case, it was not error for the trial court to decline to order notice to the Cherokee tribe. Mother's statement must be considered in view of the mental health issues from which she was suffering at the time, which included delusional thoughts. While mother was scheduled to be released from prison in January 2018, she was instead involuntarily held at Patton State Hospital due to mental health concerns. Mother was unable to have a cohesive conversation. She remained delusional several months later when the social worker interviewed her at the hospital. Mother then reported she had

15

many children, although this was known to be untrue. Mother reported speaking to Christopher on the phone and understanding him even though he was nonverbal. Mother insisted Christopher could walk and talk when he was in her custody, and sought DNA testing because she thought Christopher was not her child. Mother's discharge date from Patton State Hospital was later extended due to continued concerns about her mental health. Given mother's delusions, the juvenile court was justified in its implied finding that mother's statement of possible ancestry with the Cherokee tribe was unreliable.

The juvenile court's decision is supported by the reliable testimony of mother's relatives. MGM reported there might be American Indian ancestry on the maternal side of family, but she was unsure which tribe or tribes might be involved. MGM noted that her father, who was deceased, was part of the "'Gee chee' (unknown spelling) tribe." She also noted her mother might have ancestry with a tribe in Arkansas. MGM offered that mother's biological father's family might have American Indian ancestry, but she did not have the contact information for any of mother's paternal relatives. Lula also reported she did not know much about any American Indian ancestry, as her parents kept it a secret. She understood the American Indian ancestry to be "West Indian or Blackfoot." Lula added that mother's maternal great-grandfather may have had American Indian ancestry, but she did not know where he was born nor did she have any further information about him. She did not know which tribe might have been involved nor did she have any information about the parents of the maternal great-grandfather.

16

Significantly, none of mother's other relatives mentioned Cherokee heritage in the maternal family. Only mother mentioned it. And previously, when mother was asked in June 2017 about her American Indian ancestry, she stated that she "probably has some because 'I have a couple of my grandmas inside of my body.'" Mother was unable to further explain any ICWA-related information. Thus, her later statement that she had possible affiliation with the Cherokee tribe lacked credibility—particularly when it was made near the time she demonstrated delusional behavior and had to be institutionalized for mental health reasons.

As set forth above, we review the juvenile court's ICWA findings under the substantial evidence test. (*Dezi C., supra*, 79 Cal.App.5th at p. 777.) There was sufficient credible evidence from maternal relatives that the Cherokee tribe was not part of Christopher's ancestry. The juvenile court was not required to credit mother's lone indication of such heritage, viewed in light of mother's delusional behavior and forced hospitalization. Notice to the Cherokee tribe was unnecessary under the circumstances.

## III. The ICWA investigation is ongoing

Finally, we note the ICWA investigation is ongoing in the present matter. "[T]he only order which would be subject to reversal for failure to give notice would be an order terminating parental rights." (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 385.) No such order is before us here. The order terminating MGM's status as legal guardian does not affect a tribe's right to intervene in the proceedings, which are ongoing.

The juvenile court repeatedly ordered DCFS to continue to investigate Christopher's possible American Indian heritage. The juvenile court thus recognized that "the duty to inquire is a

17

*continuing* one." (*In re S.H.* (2022) 82 Cal.App.5th 166, 176.) And even after a juvenile court has concluded that ICWA does not apply, it "retains the power (and duty) to *reverse* that determination 'if it subsequently receives information providing reason to believe that the child is an Indian child.'" (*Ibid.*) The juvenile court and social workers in this case expressed awareness of their continuing duty. The court made its ICWA finding without prejudice, and has ordered DCFS to continue to investigate the issue.

The juvenile court did not err in making its preliminary determination that ICWA was inapplicable at this stage of the proceedings. Because the record before us makes clear the ICWA investigation was ongoing below, should it become known, or should there be reason to know, that Christopher is an Indian child, the notice requirement will be activated, and the relevant tribe or tribes will need to be notified. The order terminating MGM's legal guardianship need not be reversed in order to direct the court and DCFS "to do something they recognize they must do anyway." (*In re S.H., supra,* 82 Cal.App.5th at p. 177.)

## DISPOSITION

The order terminating MGM's legal guardianship is affirmed.

_____
CHAVEZ, J.

We concur:

_____          _____
LUI, P. J.                                          ASHMANN-GERST, J.

18